**In re NORTHEAST DAIRY COOPERATIVE FEDERATION, INC., Debtor.**

**Bankruptcy No. 85–00721.**

United States Bankruptcy Court, N.D. New York.

Feb. 19, 1987.

Scolaro, Shulman, Cohen, Lawler & Burstein, P.C., Syracuse, N.Y., Hancock & Estabrook, Syracuse, N.Y., for debtor; William J. Leberman, James J. Canfield, of counsel.

Menter, Rudin & Trivelpiece, P.C., Syracuse, N.Y., for Creditors' Committee; Peter Hubbard, of counsel.

## MEMORANDUM–DECISION AND ORDER

STEPHEN D. GERLING, Bankruptcy Judge.

The Court has before it the application of Charles Stube, Inc. ("Stube, Inc.") seeking payment of an administrative expense in the nature of a broker's fee pursuant to § 503(b)(1)(A) of the Bankruptcy Code, 11 U.S.C. §§ 101–151326 ("Code). The applicant seeks compensation for its services, as well as those individually performed by its principal, Charles Stube ("Stube"). Stube, Inc. seeks the $21,000.00 fee as a result of its having brought about the sale of a milk plant formerly owned and operated by debtor Northeast Dairy Cooperative Federation, Inc. ("Debtor") in Middlebury Center, Pennsylvania ("Middlebury plant").

Stube, Inc.'s application is opposed by the Official Creditors' Committee ("Committee") of the Debtor, as well as Consumer Plastics Corporation, an individual creditor.

Hancock and Estabrook, ("Hancock"), attorneys for the Debtor, have filed an affidavit in support of Stube, Inc.'s claim to an administrative expense.

## FINDINGS OF FACT

On August 30, 1985, the Debtor filed a voluntary petition pursuant to Chapter 11 of the Code in the United States Bankruptcy Court for the Northern District of New York ("Court"). Debtor continued to operate its business as a debtor-in-possession pursuant to Code § 1107 and § 1108. Among the assets of Debtor's estate was certain improved real property located at Middlebury Center, Pennsylvania, utilized by Debtor as a milk plant.

On or about November 12, 1985, Debtor reached a decision to divest itself of the Middlebury plant and enlisted the services of Stube and Stube, Inc. to find a buyer in return for the payment of a commission in an amount to be agreed upon. On April 9, 1986, the Debtor, by its president, James G. Patsos ("Patsos") sent a letter to Stube in which he confirmed "our agreement for a finders fee due you when the Middlebury Center plant is sold to Dietrich's Milk Products, Inc." (Affidavit of Charles Stube, Exhibit A, sworn to August 4, 1986). ("Stube affidavit").

On May 19, 1986, the Debtor received the Court's approval to sell the Middlebury plant to Dietrich Milk Products, Inc. ("Dietrich") for the sum of $800,000.00. In accordance with the fee schedule contained in the Patsos letter dated April 9, 1986, Stube would have been due $21,000.00 as a finders fee.

Prior to entering into the agreement with Debtor, Stube, acting through Stube, Inc., had approximately 40 years of experience in the dairy industry as both a "consultant and broker for the dairy industry." (Stube affidavit, ¶ 4). However, it is clear that neither prior to nor during the period in which Stube or Stube, Inc. worked to bring about the sale of the Middlebury plant, was

either a "licensed" real estate broker in the State of New York or the State of Pennsylvania. Stube was intimately familiar with the Middlebury plant, for he had served as its Director of Operations from 1973 to 1985 while in the employ of Cooperative Marketing Agency and also as an independent consultant for Eastern Milk Cooperative and the Debtor, the plant's subsequent owners.

Between November 1985, and the date of sale of the Middlebury plant, both Stube and Stube, Inc. devoted substantial amounts of time to the sale of the plant. Despite these efforts, which were known to Debtor through its president, Patsos, the Agreement of Purchase and Sale for the Middlebury plant between Debtor and Deitrich, dated April 21, 1986, specifically provided at paragraph 10 therein that the negotiations which led to the Agreement of Purchase were carried on by the "Seller [Debtor] directly with Buyer [Dietrich] in such a manner as not to give rise to any valid claims against any of the parties hereto for brokerage commissions, finder's fees or like payment."

Neither Patsos nor Hancock satisfactorily explain the inclusion of paragraph 10 in the Agreement of Purchase and Sale in light of their admitted and apparent knowledge of Stube's efforts in bringing about the sale, and the agreement to compensate him accordingly. Yet the record reveals that as a direct consequence of the efforts of Stube and Stube, Inc., Debtor received a sale price for the Middlebury plant approximately $90,000.00 more than its appraised value.

At no time prior to the date of the instant application was Stube or Stube, Inc. appointed by the Court to act on behalf of the Debtor pursuant to Code § 327(a). The Committee was not aware of Stube's involvement in bringing about the sale to Dietrich when it joined with the Debtor in applying to the Court for an order pursuant to Code § 363(b)(1) authorizing the Debtor to carry out the Agreement of Purchase and Sale dated April 21, 1986.

## ARGUMENTS

Stube, Inc. and Stube argue that since neither are licensed real estate brokers, they are not "professionals" within the meaning of Code § 327(a) and, therefore, there is no requirement for their formal appointment. In this same vein, Stube and Stube, Inc. contend their efforts did not constitute intimate involvement in the administration of the Debtor's estate so as to require appointment by court order. Thus, Stube and Stube, Inc. conclude the finder's fee is due and owing, and constitutes an administrative priority claim pursuant to Code § 503(b)(1)(A).

The Committee counters with case law holding that a licensed real estate broker is a professional within the meaning of Code § 327(a); absent appointment by court order, such a professional cannot be compensated regardless of what benefit he may have provided to the estate. Further, the Committee notes that professional appointment nunc pro tunc is prohibited within the jurisdiction of the United States Court of Appeals for the Second Circuit, except in limited circumstances. Additionally, the Committee contends that if the Court accepts the argument that since they were unlicensed, they are not professionals, then Stube and Stube, Inc. have acted in violation of both New York and Pennsylvania statutes which require the licensing of real estate brokers.

## CONCLUSIONS OF LAW

This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) & (B), and the Court has jurisdiction pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a).

Courts have defined the term "professional" as it is used in Code § 327(a), not so much from the type of services rendered by a person or entity, but rather by looking to the relevance those services have in the course of a Chapter 11 proceeding. Thus, a true, licensed "professional", as that term is generally construed, may be so directly involved in a debtor's day to day operations (possibly even as a salaried employee) that he or she would not constitute

a "professional" for purposes of Code § 327(a).

Clearly, however, absent intimate involvement in a debtor's daily operations, real estate brokers are "professionals" within the meaning of Code § 327(a). *See Vaniman International, Inc. v. Rick Kreindler Asso., Inc.*, 24 B.R. 207, 208 (E.D.N.Y.1982); *Glick v. Brogan (In re Roberts)*, 58 B.R. 65, 67 (Bankr.D.N.J. 1986); *In re C.H. Stuart, Inc.*, 16 B.R. 296, 297 (Bankr.W.D.N.Y.1981); *Frankfurth v. Cummins (In re Cummins)*, 8 B.R. 701, 702 (Bankr.C.D.Cal.), *rev'd on other grounds* 15 B.R. 893 (Bankr. 9th Cir.1981), *reh'g denied* 20 B.R. 652 (Bankr. 9th Cir. 1982).

■ Stube and Stube, Inc. rely upon the opinion of Judge Ryan in the oft-cited case of *Matter of Seatrain Lines, Inc.*, 13 B.R. 980 (Bankr.S.D.N.Y.1981), wherein it was held that two maritime engineers sought to be retained by debtor as consultants were not professionals within the meaning of Code § 327(a). While the decision does not specify the services to be performed, the engineers were to "play an important role in the mechanics of [debtor's] operations." *Id.* at 981. Judge Ryan concluded that court approval is only necessary for the retention of professionals who are "intimately involved in the *administration* of debtor's estate." (emphasis added). *Id.*

Stube and Stube, Inc. contend they were not intimately involved in the administration of Debtor's estate. In those cases where courts have held a real estate broker to be a professional, Stube argues the broker was a central figure in the sale of a principal or major asset of the debtor. However, the Court believes Stube and Stube, Inc. inaccurately distinguished between professional involvement in the "administration" of the estate, and in involvement in the "mechanics" of the Debtor's day to day business operations. *Id.; United States v. Aetna Cas. & Sur. Co.*, 43 B.R. 119, 121–22 (M.D.Tenn.1984).

Clearly, one of the goals Congress sought to achieve in enacting the Code was the removal of the bankruptcy court from the day to day operation of the debtor's estate. Thus, debtors were given wide range to retain professionals to assist in the daily business routine, or mechanics of the business, absent court approval. *Id.* at 121. Consequently, absent a court order, a professional consultant may be retained by a debtor-in-possession, either as an independent contractor or a salaried employee, to assist in a more efficient business operation. This action thereby avoids the very operational pitfalls which brought about the debtor's filing of a Chapter 11 petition in the first instance. Such a professional is clearly not engaged in the administration of the debtor's Chapter 11 case. Administration of the estate entails the progress of the Chapter 11 case through the bankruptcy court from filing of the petition to confirmation of a plan.

In the instant case, Stube, while acting as an employee of or independent consultant to the Cooperative Marketing Agency, Eastern Milk Producers and then Nedco, served as Director of Operations for the Middlebury plant. Stube does not seek compensation for these services, yet had the same arisen during the course of the Debtor's case, these are the type of activities for which formal court appointment pursuant to Code § 327(a) would not have been a prerequisite.

However, when Stube met with Patsos in November of 1985, it was not to discuss Stube's services to Debtor as an independent consultant for the ongoing operation of the Middlebury plant, for the Debtor was considering liquidation of its assets at that time. Rather, Debtor then sought to retain Stube and Stube, Inc. to find a buyer for what was then one of the Debtor's most substantial assets. In this capacity, Stube and Stube, Inc. were retained to assist Debtor in the administration of its plan to liquidate its assets.

■ Stube and Stube, Inc. also argue that because they were not licensed real estate brokers at the time they located Dietrich, the ultimate purchaser, they cannot be considered "professionals" within the meaning of Code § 327(a). Again, such an argument is misplaced since it is the relevance to the estate of the services pro-

vided, rather than the qualifications of the provider, which mandate compliance with Code § 327(a).

■ Consequently, in *Windsor Communications Group, Inc. v. Rogers and Rogers, Inc. (In re Windsor Communications Group, Inc.)*, 54 B.R. 844 (Bankr.E.D.Pa.1985), the bankruptcy court held that a collection agency was a "professional" within the meaning of Code § 327(a).

> The requirement of court approval under § 327(a) extends to any individual or entity that is intimately involved with the administration of the bankruptcy case.... The services performed by Rogers were clearly of a professional nature [, as ...] the collection of accounts receivable has been central to the administration of this case."

*Id.* at 848–49; *See also Committee of Abestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612 (Bankr.S.D.N.Y.1986).

The fact that neither Stube nor Stube, Inc. were licensed at the time they brought about the sale of the Middlebury plant to Dietrich may constitute a violation of state law, but it is of no consequence to the Court in determining whether or not § 327(a) is applicable.

The Court concludes that both Stube and Stube, Inc. were professionals within the meaning of Code § 327(a) and, therefore, their employment by the Debtor required the prior approval of the Court.

■ The consequences of a debtor's failure to secure prior bankruptcy court approval of a professional's employment within the jurisdiction of the United States Court of Appeals for the Second Circuit are indeed harsh. With very limited exceptions, the so-called "per se" rule controlling in this Circuit prohibits the payment of compensation to a professional who renders services to a debtor absent an order of appointment. *See Futuronics Corp. v. Arutt, Nachamie & Benjamin (In re Futuronics Corp.)*, 655 F.2d 463, 469 (2d Cir. 1981), *cert. denied*, 455 U.S. 941, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982); *Smith v. Winthrop, Stimson, Putnam & Roberts (In re Sapphire Steamship Lines, Inc.)*, 509 F.2d 1242, 1245–46 (2d Cir.1975); *In re Progress Lektro Shave Corp.*, 117 F.2d 602, 604 (2d Cir.1941); *General Motors Acceptance Corp. v. Updike, (In re H.L. Stratton, Inc.)*, 51 F.2d 984, 988 (2d Cir.1931); *In re Rogers-Pyatt Shellac Co.*, 51 F.2d 988, 992 (2d Cir.1931); *In re Cuisine Magazine, Inc.*, 61 B.R. 210, 216–17 (Bankr.S.D.N.Y. 1986); *In re Sapolin Paints, Inc.*, 38 B.R. 807, 817 (Bankr.E.D.N.Y.1984); *Hucknall Agency, Inc. v. Nanni (Matter of Hucknall Agency, Inc.)*, 1 B.R. 125, 126–27 (Bankr.W.D.N.Y.1979).

■ The rationale for the "per se" rule is two-fold; it assures the bankruptcy court that professionals seeking appointment are truly disinterested, and also controls the cost of professional services to the estate. *See In re Sapolin Paints, Inc., supra*, 38 B.R. at 817.

Court approval prior to rendition of professional services is required as "[o]nly in this way can claims be avoided for volunteered services which may or may not have been such as what would have [been] authorized." *In re Eureka Upholstering Co., Inc.*, 48 F.2d 95, 96 (2d Cir.1931).

In the instant case, it is undisputed that neither Stube nor Stube, Inc. were appointed to act as a broker or finder on Debtor's behalf. Nor was any effort made to have either party appointed before or after they rendered the services for which compensation is sought.

Under similar circumstances, courts in other circuits have considered appointments of professionals nunc pro tunc. *See Fanelli v. Hensley (Matter of Triangle Chemicals, Inc.)*, 697 F.2d 1280, 1289 (5th Cir.1983); *Cohen v. United States (Matter of Laurent Watch Co., Inc.)*, 539 F.2d 1231, 1232 (9th Cir.1976); *In re King Elec. Co., Inc.*, 19 B.R. 660, 663 (E.D.Va.1982). In this circuit, however, the use of nunc pro tunc appointments is generally not permitted. *See Futuronics Corp. v. Arutt, Nachamie & Benjamin (In re Futuronics Corp.), supra; Smith v. Winthrop, Stimson, Putnam & Roberts (In re Sapphire Steamship Lines, Inc.), supra; In re Rog-*

ers-Pyatt Shellac Co., supra; Matter of Hucknall, Inc., supra.

It appears the only recognized exception to the harsh result occasioned by application of the "per se" rule is "excusable neglect" or "unavoidable hardship". *See In re Rogers-Pyatt Shellac Co., supra*, 51 B.R. at 992; *In re Amherst Mister Anthony's Ltd.*, 63 B.R. 292, 294 (Bankr.W.D.N.Y.1986); *In re Brown*, 40 B.R. 728, 731–32 (Bankr.D.Conn.1984).

■ Excusable neglect has been consistently interpreted to mean "the failure to timely perform a duty was due to circumstances beyond the reasonable control of the person whose duty it was to perform." *Beneficial Fin. Co. v. Manning (In re Manning)*, 4 BCD 304, 305 (Bankr.D.Conn. 1978). Stated another way, "[e]xcusable neglect is present when a party fails to meet an obligation due to 'unique or extraordinary' circumstances ...". *In re Waterman Steamship Corp.*, 59 B.R. 724, 727 (Bankr.S.D.N.Y.1986), *quoting Maryland Casualty Company v. Conner*, 382 F.2d 13, 17 (10th Cir.1967). Of course, the party seeking relief bears the burden of showing circumstances constituting excusable neglect. *Hassett v. Weissman (In re O.P.M. Leasing Services, Inc.)*, 48 B.R. 824, 830 (S.D.N.Y.1985).

In examining the instant case, the Court is not aware of any circumstances which would constitute excusable neglect.

■ The fact that Stube and Stube, Inc. may have been ignorant of the need for their appointment by the Court is of no consequence. *See In re Carolina Sales Corp.*, 45 B.R. 750, 755 (Bankr.E.D.N.C. 1985); *In re BSJ Tower Asso.*, 35 B.R. 131, 134 (Bankr.D.P.R.1983). Nor does it appear that Stube or Stube, Inc. was led to believe the Debtor had undertaken their appointment pursuant to Code § 327(a), and consequently took no action themselves.

■ The Court is perplexed by the fact that Patsos had considerable contact with Stube during the course of the latter's performance of services on the Debtor's behalf, with these services culminating in the agreement outlined in Patsos' letter to Stube dated April 9, 1986. A copy of this letter is indicated as having been sent to Hancock; Hancock denies ever having received the same. Yet when the Debtor and Dietrich entered into the agreement of sale for the Middlebury plant on April 21, 1986, the same specifically recites that no broker brought about the sale. Presumably, Patsos reviewed this document prior to its execution.

It is unrealistic to assume that Patsos never once made Hancock aware of the prominent role played by Stube and Stube, Inc. in the course of the negotiation and sale of a major asset such as the Middlebury plant, continuing over a period of some six months.

Be that as it may, and with some regret, the Court is unable to hold that these facts present such unique or extraordinary circumstances which would invoke the very narrow exception to the "per se" rule.

Finally, the Committee makes the persuasive argument that absent a pre-sale disclosure of Stube's proposed involvement in the transfer of the Middlebury plant, the Committee was denied the opportunity to bring about a negotiated sale free from a claim for a brokerage or finder's fee. While the Committee's optimism is enhanced by the luxury of hindsight, and in all probability Stube and Stube, Inc. would have been appointed had timely application been made, the sad fact remains that official appointment did not precede the rendition of services. As Judge Goetz has observed:

It is well established that professional services rendered are not compensable from a debtor's estate if such services have not been previously authorized by the bankruptcy court. That such services may have been beneficial or valuable to the estate and performed in good faith is immaterial, as is hardship to the unauthorized professional. (Citations omitted).

*In re Sapolin Paints, Inc., supra*, 38 B.R. at 817.

The Court additionally observes that even were Stube and Stube, Inc. able to

prove an exception to the "per se" rule in the present case, the application does not contains the requisite detailed time records which would assist the Court in determining whether or not the commission sought was warranted.

Due to the foregoing, the Court need not determine the issue that approval of the commission would act to condone a violation of either New York or Pennsylvania law, both of which prohibit the unlicensed operation of a real estate brokerage business.

As a result, the application of Charles Stube, Inc. seeking payment of an administrative expense in the nature of broker's fee is denied.

IT IS SO ORDERED.